Please be seated. Would the clerk call the next case, please? Thank you. Mr. Cebula? Did I say that correctly? You did. May it please the Court, Counsel? My name is Nicholas Cebula, and I'm here on behalf of the appellant, Andre Harrison. Mr. Harrison was employed with the Appellee Deere & Company in various positions. His most recent position before he was terminated was operations manager for the seating company. While in early September of 2009, Mr. Harrison was brought in for an investigation by Deere & Company. During that investigation, which was approximately three days in length, various witnesses were asked questions about relationships that Mr. Harrison had with other Deere employees. And at the conclusion of that investigation, Mr. Harrison was terminated. Immediately upon termination, Mr. Harrison requested his personnel records from Deere & Company. In particular, he sent it to one of the vice presidents of HR. At such time, he requested that he be able to review his personal records in conformance with the Illinois Personnel Records Review Act. The task of his personnel records was sent to one Sherry Martin, who was also some sort of HR director at Deere & Company. During the time certain records were provided to Mr. Harrison, however, the investigation report that was conducted in early September was absent. Upon receipt of his materials, Mr. Harrison noticed that the investigation report was missing and sent another email to Deere & Company requesting that that investigation report be provided to him. In the meantime, a couple of different things happened. One, Sherry Martin went on to some sort of vacation. It's disputed whether it was an extended vacation or a large weekend adventure, but in addition to that, Mr. Harrison began filing certain lawsuits. The most notable one was Pollack-Addington v. Harrison. In addition to that, outside counsel was retained by Deere & Company. At such time, requests went to the outside counsel, and eventually Mr. Harrison was provided the investigation report approximately 17 days after his initial request. Mr. Harrison then brought this suit under Section 2 of the Illinois Personnel Records Review Act and also sought damages under Section 12d-2. At trial, there's no dispute that the district court did find Deere & Company violated the Illinois Personnel Records Review Act. However, she found that the violation wasn't willful and annoying, and in particular, she based that on the information and knowledge of Sherry Martin. Sherry Martin testified to various things throughout the trial, but most notably, she stated that she didn't actually review the Illinois Records Review Act, and she also was certain at the time that the investigation report likely was not going to be provided to Mr. Harrison. Now, we are appealing the second part of that, whether or not this is a willful and annoying violation of the Illinois Records Review Act. In particular, we know that – Before you get there, let me ask you, when did you finally get all the records? About 17 days after. Well, you've got a date there. No, it was I believe the beginning of October. October of? 2009. 2009. Well, in September of 2011, you filed a suit in federal court, right? That's correct. Why didn't you file this there? I'm not quite sure as to the strategy as to how the suit started, but – So then why wouldn't it be raised through the court? In other words, the federal court has penitentiary jurisdiction on state court claims, don't they? They do, and certain – There's the race judicata issue on a couple of other claims that were brought on this appeal. There's I believe four issues that possibly are subject to race judicata. Our contention on that is that we do not believe that the privacy aspect is met. In the Eddington decision and in the federal decision that looked to Eddington, they described how the managers and Deere were possibly in privity, but there was never any analysis done as to whether or not they actually were. And it's our contention that until that analysis is done, it's unclear as to whether or not race judicata actually would apply here. Well, this suit is against Deere, correct? Correct. And the suit in federal court was against Deere? Correct. And the plaintiff was the same plaintiff here? Correct. And by the time he filed this federal suit, he knew that this was filed? Did he? That's correct. So in race judicata, as far as any suit that – any claim that was filed or could have been filed, right? That's correct. Again, we are arguing that the privity portion has not been fully examined as to whether or not it would apply here. However, during the briefing session, it was contended that this part of the case was not going to be subject to race judicata. This record review portion of it. And we have briefed that portion, assuming that fact. However, as you mentioned, if this court finds that race judicata would apply because of privity issues, then obviously race judicata would apply. However, it's still our contention that race judicata doesn't apply to this portion of it. And in addition to that, the court abused its discretion in providing that there wasn't a willful and knowing violation. Primarily because this act doesn't have much case law on it. There's only one case that we found that actually describes the willful and knowing portion standard, and it's an appeals court decision, Landwehr v. Sytax American Corp. In that the appellate court uses several different terms. Willful, or I'm sorry, an intentional disregard of a known duty, an intentional disregard and a conscious indifference to the consequences of the action or inaction. And the court itself used bad faith and intentional disregard. And we think that that applies here to the appellee Deering Company. What the district court focused on was the knowledge and aspects of Sherry Martin. However, there was a lack of any discussion on the part of what appellee Deering Company knew. Now, Deering Company has a legion of attorneys. They have a legion of compliance officers. They have a legion of HR individuals. Let me just, by the way, it looks to me like this suit was probably filed before the federal suit. So I probably missed the mark here. This suit was already on file before the federal suit was filed. That might be, yes. Sorry about that. No, that's all right. Again, I still stand by it. If the court finds that there is a race judicata, it's a race judicata. But we believe that this part does survive and that there's a willful and knowing violation because Deering knew the requirements of the Illinois Records Review Act. And that's best shown by their policy in which they created an internal policy that required that any records dealing with discipline be provided through the personnel file. And in this case, it's unintended. I'm sorry. John Deere brought up a couple of different points at the district court level as to why this investigation report should not be included under the Illinois Personnel Records Review Act. Both of those contentions, one that it wasn't an investigation report or disciplinary report, and the second one that there was litigation forthcoming, were, I don't want to say dismissed, but were discredited by the district court. And the district court went on to find that there was a violation. However, the district court focused on Sherry Martin's complete disregard and reckless disregard of the Illinois Review Act because Sherry Martin testified a couple of times that she knew that the Illinois Records Review Act applied in certain cases, but she never actually read what it said. She just assumed that she knew what records would be provided and what records wouldn't be provided. And she never actually asked anybody at Deere and Company whether or not this investigation report needed to be provided. Is there any prejudice requirement in the Records Act? In other words, so your client got the records a few days late, so what? I mean, what was the damage to him? The Act itself doesn't describe any form of prejudice. And the public policy, as the appellate court described in the Landware case, is to create an equal footing for the employer and the employee. In this case, the employer was facing termination. He had to make decisions shortly thereafter, whether to bring suit, whether to seek a severance package, whether to pack his bags and head out of town. But he had no idea why he was being terminated. When he received the actual records that were provided by Sherry Martin, it was all positive, glowing remarks about him. He was more confused, but he knew that there was an investigation going. And without being able to see that investigative report, he wasn't able to make the decisions that were necessary. And by the time the review records came, like I said, suits had been filed, outside counsel had been retained, and there was no ability to then go forward with those various options that may have been available to him if immediately he had been able to review that investigation report. So the act doesn't actually describe a need for prejudice. But in this case, it's a practical matter. He was prejudiced in some form or manner. Even though it was only 17 days later, as appellate leaders pointed out in their brief, in that 17 days, a lot of things happened. There were emails exchanged, and counsel was retained, and a suit was filed. Looking back, had it been seven days, it's very possible that we would have avoided a lot of litigation. But in a previous decision of this Court, the contents of those records that he finally got showed that he was probably appropriately fired. So getting those records 17 days sooner helped him how? Under this factual scenario, that's probably true. However, it's not necessarily true. And again, we go back to immediately upon termination, an employee has to make quick decisions. And the act was created to equal the playing field on what knowledge the employer and the employee know. The employer knows why, in this case, Mr. Harrison was terminated. Mr. Harrison was not sure why he was terminated. And upon review of his personnel records that he received, he was even more baffled as to why, and therefore went forward with the suit. Had he seen the investigative report, he might have been able to determine. But I have not found a case law that describes it. But he ultimately did see the investigation report, and then he filed a suit in federal court. So once he knew everything that he said he should have known by the event, it didn't stop him from filing a lawsuit. Hindsight is 20-20. At the time, however, there was a crisis to him, in that he was unable to be on an equal footing with the employer as to what knowledge and why he was terminated. What steps were taken afterwards after that initial suit? That's a circumstance of conditions that were created because fear and company did not provide that initial record. It's very possible that we would have had a different scenario had the investigative report been provided initially. But again, going back, I don't have a case that says that there was a crisis necessary. I, once again, would point to the appellate court's decision in land where they described the equal footing. If the employee is not on an equal footing with the employer, there's automatically going to be some sort of prejudice to the employee when termination occurs. In addition to that, the district court then went on to initially describe that this reckless disregard for the statute was not sufficient to meet the requirements of the willful and knowing violation. There was a motion to reconsider. The district court then changed its mind and said there was a willful and knowing violation. There was another motion to reconsider. And again, the district court referred it back and said that while Sherry Martin was reckless in her disregard for the act, it was not willful and knowing. It's our contention that, in fact, that reckless disregard for what the requirements of the Illinois Personnel Records Review Act are is a knowing and willful violation of that. In support of that, we have cited to a case out of Virginia. It's little v. Virginia Retirement System. And in that case, the Virginia court goes through the Virginia Freedom of Information Act. And while that's not necessarily the exact same thing, what the court did focus on was that a person that's in a position of authority and needs to be aware of the requirements of an act in providing information to other individuals has to have a good faith ignorance of the law. And in that case, they found that the individual not actually reading the act and not going to other individuals to find out what the act contained was not a good faith but bad faith ignorance of the law. And we would say that's the same thing here. Sherry Martin had, like I said, a legion of attorneys, a legion of compliance officers, and further HR individuals that she could have contacted to ask about this act. Let me ask you this. What is it, panel three of your complaint talks about wrongful termination and violation. What's that? The wrongful termination, I would have to say that I would tell you guys to look at our brief for support on that matter. Like I said, there are four issues that obviously are facing race judicata on this case. Again, I would go back to the privity argument that I articulated earlier. It's our contention that there's not a privity issue here, or there is a privity issue here. The analysis hasn't been done, and until such time, race judicata is inappropriate on that issue. What's the public policy that he was terminated in violation of? I believe his termination was for misconduct with direct subordinate or some sort of subordinate. Right, but your claim in that count is that the termination was wrongful as a violation of public policy. I don't know what public policy it is that you're vindicating here. That public policy is the privacy issue. The incidents that were involved in this investigation were all acts that were done outside of work. Not on work time, but with a subordinate, our client. We believe that it's a violation of an employer to dig deep into private acts that are done off of company time, off of company property. These private acts were done with the daughters and wives of subordinates too, right? Yes, they were. You think a reasonable employer would find out this can lead to nothing good? Somebody's going to come in here and come after that guy, maybe it worked. There's a possibility that that could occur. However, again, it's a private act that was done on private time, off of the company premises. Nobody from that relationship brought that complaint to Deere's attention. It was acts done in violation of Deere's policy though, right? Deere's employment policy. Those particular acts that we're talking about? I'm not sure. I can't give you a for sure answer on that. I would believe so, but I'm not certain. Again, we believe it was a willful and knowing violation for Sherry Martin to completely disregard the act and never look at it, never ask anybody about the act. We request that you review those acts as erroneous and an abuse of the trial court's discretion. Thank you, Mr. Sibula. Mr. Boren? Boren? Boren? Please, the court, counsel. So, as alluded to by opposing counsel, this case is actually the third surviving case of three that Mr. Harrison filed following his termination from employment at Deere back in September 2009. All three of those actions and every claim in those actions, save for one, which is the issue that went to trial, were all based on the exact same facts that gave rise to the investigation and decision to terminate Mr. Harrison's employment back in 2009. Two of those cases, as I mentioned, are now done. They've proceeded to final judgment. This court affirmed the judgment in one of those cases in the Addington matter. The Seventh Circuit Court of Appeals affirmed the dismissal of federal action Mr. Harrison brought more recently. And as explained in our briefing, we think both of those cases are final judgments in our rest judicata as to all of Mr. Harrison's claims in this matter, with the exception of the willful and knowing violation of Section 2 of the Personal Record Act. And the reason that's an exception is because the events given rise to that claim happened after the investigation and decision to terminate Mr. Harrison's employment and weren't connected, so we did not argue that rest judicata right there. Because opposing counsel has devoted the bulk of his attention to the trial issue, I'll do the same. This case proceeded to trial after extensive briefing through summary judgment on the personnel record review. As you've been made aware, there's no dispute in this case that Mr. Harrison had all of the documents he's ever claimed entitlement to within 17 business days of his personal records request. The trial court determined in summary judgment that Deere did commit a technical violation of the Personal Records Review Act because a portion of those documents, what's been referred to as the investigation report, wasn't provided until the 17th business day. So it was outside the seven-day window set forth in the Act. All of the other documents were provided to Mr. Harrison within that seven-day period. So the only question before this Court is whether Deere willfully and knowingly violated the Act when it was tardy in providing those documents. And we think that based on the only appellate court decision that's been decided on this issue, there's no question that the trial court's decision was correct and should be affirmed. And I would note that it is an abuse of discretion at this standard, at this stage. In the Landwar case, the employer took a very different tact than Deere did here. They didn't believe certain documents that ultimately were used in compensation decisions related to the plant were covered by the Personnel Records Review Act. So they refused to turn them over. The plaintiff sued, brought a motion to compel. In the trial court, the trial court granted that motion, but the employer still refused to turn them over. Only after the appellate process was completed did the employee in that case ever get his hands on the documents. In that case, despite all of that, the sort of stonewalling by the employer, the appellate court held that there's no willful and knowing violation of the Act in not turning over the documents because at the end of the day, reasonable people might differ as to whether the documents were covered by the Personnel Records Review Act. And that's essentially what happened here. As Judge Lepstein made clear in her opinion, in 2009, it was not clear cut whether this investigation report was a personnel document. There's a couple of reasons for that. The first is that Section 2 of the Personnel Records Review Act, by its plain language, only applies to documents that are, quote, used in decisions to terminate employment. The investigation report was not used in the decision to terminate Mr. Harrison's employment. In fact, it wasn't prepared until a full week after the termination, and it was prepared by an entirely different department than made the termination decision. Sherry Martin, who was responsible for turning over documents, didn't, and the trial court made this factual finding, which is subject to an extremely high standard, made the determination that Martin honestly believed the investigation report wasn't a document that had to be turned over, either under Deere's policy or under Illinois law. And the reason for that is an investigation report of this nature had never been in a personnel file, as she had said. The investigation report does not impose any discipline of any kind, so she did not believe it to be a disciplinary record. And the investigation report was not used in the decision to terminate Mr. Harrison. Based on that, Deere argued that it's under a judgment stage, and it's not a personnel document to begin with, within the plain meaning of the Act, and therefore there was no obligation to turn it over. Deere also argued that even if it had been a personnel record, there's an exception in Section 10 of the Personnel Records Review Act that does not require employers to turn over personnel records when there's another pending claim by the employer. At the same time Mr. Harrison was requesting his personnel records, his attorney, Mr. Hueberger, who's not here today, was sending courtesy copies to Jim Jenkins, the general counsel at Deere, of lawsuits that Mr. Harrison intended to file based on the events related to his termination. So Deere argued that at that point there was another pending claim, and that exception applied. Ultimately, the trial court disagreed with those arguments, but agreed that they were good faith arguments if they were reasonable on their face. And we submit, Your Honors, that that is the definition of the type of reasonable minds might differ standard that Landwer set out. Landwer also talked about bad faith, as did my colleague today. There's no evidence of bad faith in this record. The judge, again, concluded that Ms. Martin, albeit possibly incorrectly, that's debatable, reasonable minds could differ, honestly believed that the investigation report was not a personnel document that had to be turned over. And when Martin was confronted with Mr. Harrison, Mr. Harrison didn't say where's the investigation report. He said there are no documents related to the investigation. If there are any, please turn them over. Ms. Martin immediately responded to that email, although she was out of the office, and said on September 17th, I'll follow up with you next week. Unbeknownst to Ms. Martin, Deere had received multiple complaints, formal legal complaints, that Mr. Harrison was going to file. Everybody retained attorneys. And by the time Ms. Martin returned the following week, everyone had loitered up, so to speak. So when Mr. Harrison reached out to her again on September 24th, she promptly notified him, you have legal counsel, we have legal counsel, please communicate through the attorneys. At that stage, Ms. Nina Stillman, who is an attorney at my firm, was representing Deere at the time, evaluated the documents, and despite reasonable grounds for withholding them, turned them over to Mr. Harrison's attorney on October 5th via overnight delivery. Mr. Harrison had everything he's ever asked for within just 17 business days. In fact, he had everything he ever asked for more than eight months before he ever filed the suit. And Justice Schmidt, you asked about what was the prejudice to Mr. Harrison in this situation. There wasn't any. In fact, at the summary judgment stage he conceded he had no actual damages, and the court agreed. So there were no actual damages of any kind in this case. The court awarded him costs. At the end of the day, she found that there was an ordinary violation of the Act, and so because the Act provides for costs, he got those. What this case is about, then, is whether Mr. Harrison should be able to recover attorney's fees that weren't incurred until after he got all of the documents he's ever claimed entitlement to. We don't think that's what Section 12d.2 is intended to provide, especially whereas here the evidence is clear that there's no willful or knowing violation. And with respect to the concept of prejudice in the Personnel Record Review Act, while it's not found in Section 12, Section 4 of the Act talks about other circumstances where employers withhold documents and then would seek to use those documents against the other side. It finds that in that situation the employer can't use the documents against the other side unless the court determines that the plaintiff ultimately got the documents and had a reasonable amount of time to evaluate them. So I think that the concept of avoiding unfair prejudice can be found in the Act, and that in this case it shows that Mr. Harrison suffered none whatsoever. The idea that he needed the investigation report sooner so he could decide whether or not to file a lawsuit, frankly, I don't think that that really passes the smell test. Mr. Harrison has chosen to file three separate lawsuits, all based on the exact same facts, in sequential order and in different courts. From the looks of it, it could be argued that he's done this intentionally, stretched gear out, made it defend itself in multiple forums at different times. It could be speculative, but certainly res judicata, we believe, applies in this case, and precisely to avoid that case. I'm just referring to your last statement about speculation. I mean, intentionality is a serious issue. I can't say for a fact, as a fact. Like a planned process. I'm sorry. Your suggestion of a planned process. I don't know that he did that, and I can't say that he did. Res judicata certainly exists to avoid that type of tactic, and we think that it applies here to preclude that sort of activity. But you're correct in saying I don't know specifically why it was done. And so we think that on the record the trial court was correct, that there's no evidence of bad faith here in turning over the personnel documents when they were turned over. And, again, this is a far cry from the type of situation that existed in Landward, where the employee had to go to court and fight for years to get the documents that he was ultimately awarded after all of that effort. Mr. Harrison had everything early on. Mr. Harrison, before I move on, I want to make sure I address the questions that were raised previously. One comment that was made is that the investigation report was needed so that Mr. Harrison knew why he was being terminated. Again, this is a situation where Mr. Harrison is being investigated in light of allegations that he had sexually assaulted a female co-worker and was sexually harassing another one. The woman who was allegedly sexually assaulted, her father was a direct report to Mr. Harrison and worked at the factory together. This is a very sensitive situation. That's why global security was investigating it. And during that investigation, Mr. Harrison admitted that he had inappropriate relationships. There's testimony that was discussed in the Addington matter that he conceded his conduct was far below the professional standards that were expected of him. So the notion that he had no idea why he was being terminated, I don't think works in this case. Finally, one other issue that was discussed was the wrongful termination claim. I think the argument here is that there was a violation of public policy insofar as Mr. Harrison was terminated for having a consensual relationship with a subordinate. They've made the argument that this relationship happened off of their premises. We would submit that certainly employers under an at-will employment regime that we have here in Illinois can have a policy that precludes that type of behavior. We respectfully disagree with the position that Section 9 of the Personnel Record Review Act somehow precludes that. In fact, in the Addington case, this court wrote that Mr. Harrison's conduct not only created a risk of workplace violence, but also created a risk of financial liability for Deere. And that finding blows the Section 9 argument out of the water because Section 9 specifically says we're talking about non-employment activities that won't harm the company's business, that can't reasonably be expected to lead to financial liability. We're not talking about which political meetings this person goes to or what church they go to or anything like that, which I think is what Section 9 is really after. We're talking about engaging in an inappropriate relationship not only with a subordinate, but the wives of spouses. And we don't think that public policy is violated in that circumstance. And, of course, that claim, in any event, is precluded by restitution based on a number of other cases that have already been decided. If there are no further questions, Deere would ask that the decisions below be affirmed. Thank you. Thank you. Mr. Cibula, any rebuttal? I believe we talked a little bit about the Landware case where they described reasonable minds might disagree. That little snippet from the case was in relation to the fact that the actual records that were being asked for were novel as to whether or not they would be required to be produced under the Act. And, therefore, because the employer believed that those records may not apply and the employee did believe that they applied, that the reasonable minds might differ, and there was a good faith ignorance of the law in that case. That's not the case here. Deere knew that an investigative report that led to discipline was required to be produced. They had a policy in place that required investigative reports or disciplinary reports or anything that led to discipline needed to be produced. And Deere's agent, Shirley Martin, failed to provide that report when asked for. What motive did Deere have to maliciously withhold that report? I mean, what in that report hurt Deere? The maliciousness of it isn't required under the willful unknowing. It's just that there would be some sort of intentional disregard for it. Whether or not Deere had a malicious intent for doing it, I don't know. Only Deere would know whether or not there was some sort of malicious intent. However, they knew that the document was required to be produced, and their agent intentionally didn't ask, didn't review the Act, just assumed that they knew what was required under the Act. And that type of professed knowledge without reviewing it is a bad faith ignorance of the law. Even under the Act, as counsel pointed out, that document was prepared after your client was fired. It would still be... It would contain information leading up to it, but the document itself wasn't something that says, let's rely on this document to fire him because that document didn't exist then. Shirley Martin testified that the investigative report was part of the termination decision. In that case, she knew that it was part of the disciplinary action. Well, didn't she mean that? But isn't it pretty clear that what she was talking about was the information contained in that report was used there, but the report itself, the document you were asking for, didn't exist, as opposed to some document that was sent to the chairman or whoever does the firing and say, hey, look at this. Yeah. Oh, this is bad. You're fired because this document didn't exist then. I would have to disagree. I think that her testimony is pretty clear that she knew that this investigative report was used in discipline and that the DEER policy was any materials that lead to discipline are required to be produced under the Act, or under the DEER policy, I'm sorry, and that that policy was based on the Act. And Shirley Martin never asked a single person whether or not that investigative report would need to be provided. And what we're creating is a concern here that employers will have policies in place but then never actually inform their individuals that are in charge of this Act to investigate what kind of reports are going to need to be provided. And the risk that then you run is, in these types of situations, the employer can then throw their hands up and say, well, they didn't know. They had a good faith reason to believe that it didn't exist because they never reviewed the Act. They never asked one of our attorneys or our compliance individuals whether or not that Act applied. And when we do that, we then subsume the Act itself in that the legislator provided a remedy to give this Act teeth. And what we're doing here, if we decide that an individual that just recklessly disregards whether the Act exists or asking anybody about the Act, is that when an employee has questions about certain records that should be applied, the employer can then just point the finger at the individual and say, they don't know, and we can't be held to be knowingly or willfully violating this Act. What do you submit as the remedy? Is it one that they provided or violated? I think they provide two. Appley talked about Section 4 where you can keep records out from certain litigation efforts. The second part, though, is the $200 fine, actual damages, and the attorney's fees. And the reason is it provides an incentive to attorneys to take these type of cases to allow employees to advocate for their rights under the Act. And again, as the appellate court described in Landware, the whole purpose of this Act is to put equal footing. So the employer already has, in certain cases, especially here, an army of attorneys, an army of compliance individuals. They knew what was going on. Mr. Harrison was reliant upon the employer to provide him with the records. And it was just by stroke of luck that he actually knew. Do you think it maybe weakens your argument when you say that Mr. Harrison didn't know why he was fired and he was reliant on those records? He knew exactly why he was fired. Everybody knows why he was fired now. He knew when he was fired. So there was nothing in those records. It was a surprise to him. When you argue that he needed those documents to figure out why he was fired because all he saw were these glowing reports, that argument just rings a little bit disingenuous, and I'm not sure it helps his case. He might have had a sneaking suspicion as to what the investigation was about because of the questioning and because maybe possibly individuals that were part of the investigative report talked to him. He didn't know necessarily the exact details of the investigative report and who in particular the disciplinary proceedings were going to be based upon. In this case, as I described earlier, the relationship again was something that was occurring off of the Deere premises, away from Deere time. So because of that, Mr. Harrison obviously didn't completely know what was occurring. He might have had a sneaking suspicion, but he didn't completely know, and until he actually had the investigative report that led to his discipline, he wouldn't be fully informed. But the employer was fully informed, and the act's purpose is to provide equal footing for the employer and the employee on the information sharing. But the employee should know what the employer knows, especially when, in this case, a termination occurs. And with all due respect, the sneaking suspicion that might have occurred, he deserves the right to know exactly why he's being terminated. Had they produced those documents on time, it would still have been fine, and it still would have been thrown out, and it still would have been affirmed on the field, and nothing would have changed. That's completely speculative as to what could have occurred and what should have occurred. Like we said, there was a window of opportunity for Mr. Harrison to make a decision as to what was going to occur here. He needed full information to make that decision. He wasn't provided full information. The act's purpose is to provide full information to both the employee and the employer because the employer is always a step above the employee as far as information. The legislator made that decision. If we cut out this willful and knowing part by allowing the HR directors to say that they just don't know the act, it cuts down the act itself. Again, I would say that the district court, in this case, abused its discretion on that aspect, and I would ask that this court appropriately render an adjustment in our favor. Thank you. What, again, were the actions that he had to take within 17 days? I'm not sure. Like I said, he was looking at whether or not he should sue, whether or not he should seek a severance type payment, whether or not he needed to move and find somewhere else to live, whether or not maybe there was possible criminal charges occurring, something like that. There were a variety of different avenues that were occurring because of the nature of the charges that were made, sexual assault charge. Because of that, he needed full information as to what was occurring and why he was being terminated and whether or not he could seek some sort of severance payment or some sort of review of the termination decision. I would say that that was the different avenues that he was looking at. Are there any further questions? Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in recess until 9 o'clock tomorrow morning.